**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
WEST PALM BEACH DIVISION

Case No.:_____

WYNDHAM VACATION OWNERSHIP,
INC. a Delaware corporation; WYNDHAM
VACATION RESORTS, INC., a Delaware
corporation, WYNDHAM RESORT
DEVELOPMENT CORPORATION; an
Oregon Corporation, and SHELL
VACATIONS, LLC, an Arizona limited
liability company,

       Plaintiffs,

v.

US CONSUMER ATTORNEYS, P.A., a
Florida professional corporation; HENRY
PORTNER, ESQ. an individual; and
ROBERT SUSSMAN, an individual;
PLUTO MARKETING INC., a Nevada
corporation; and 1PLANETMEDIA INC, a
Nevada corporation; JOHN DOES #1-50;
NEWTON GROUP TRANSFERS, LLC, a
Michigan limited liability company; THE
NEWTON GROUP, ESA LLC, a Michigan
limited liability company; and DC
CAPITAL LAW FIRM, LLP, a Washington
D.C. limited liability partnership,

       Defendants.

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs Wyndham Vacation Ownership, Inc. ("WVO"); Wyndham Vacation Resorts,

Inc. ("WVR"); Wyndham Resort Development Corporation ("WRDC"); and Shell Vacations,

LLC ("SV") (collectively, "Wyndham"), through counsel and pursuant to the Federal Rules of

Civil Procedure, hereby sue Defendants US Consumer Attorneys, P.A. ("USCA"), Henry

1

Portner, Esq. ("Portner"), Robert Sussman ("Sussman"), Pluto Marketing, Inc. ("Pluto"), 1Planetmedia, Inc. ("1 Planet"), John Does #1-50, Newton Group Transfers, LLC ("Newton Group"), The Newton Group, ESA LLC ("Newton ESA"), and DC Capital Law Firm, LLP ("DC Law") (collectively, "Defendants"), and state as follows:

## A. BACKGROUND ON THE TIMESHARE INDUSTRY AND DEFENDANTS' TARGETED AND NEFARIOUS SCHEME

1. Timeshare properties, also known as vacation rentals, revolutionized the vacation and travel industry and have been a popular option for families for decades.  Prior to the inception of the timeshare industry in the United States, anyone wanting to vacation in the same destination each year faced the limited options of (a) booking a hotel in advance and paying the daily rate (assuming availability) or (b) purchasing a vacation property (a significant financial investment with ongoing obligations of care, repair, and maintenance).

2. The birth of the innovative timeshare concept in the 1970s changed the vacation landscape. Now, developers, like Wyndham, can divide a single vacation unit between 52 owners, with each owner purchasing fractional interest of the whole for a specified share of the total price, i.e. deeded ownership.  Developers, like Wyndham, also sell membership interests to consumers in the form of points, which, in turn, are exchanged for use at Wyndham properties. Wyndham owners may also belong to a Wyndham program called 'Club Wyndham Plus', which allows owners to use their ownership at Wyndham resorts to stay at additional properties that Wyndham does not own, further expanding consumer's choices.

3. This concept has allowed consumers an incredible opportunity to enjoy regular vacations at the fraction of the typical cost and without the burdens associated with undivided vacation property ownership. Moreover, in exchange for payment of a regular maintenance fee,

timeshare owners receive assurance of high quality resorts every year, while simultaneously avoiding rising future prices.

4.       Today, the timeshare industry continues to thrive.  As reported by the American Resort Development Association ("ARDA"), "the timeshare industry remains healthy, showing that owners have become increasingly engaged with their timeshares and the timeshare lifestyle, while the industry continues to attract new buyers."  As of 2016, 9.2 million households in America were timeshare owners.

5.       Recently, however, a nefarious cottage industry known as "timeshare exit" has sprouted.  This insidious industry preys upon unsuspecting timeshare owners, inducing them into breaching their binding timeshare contracts, causing both the consumers and timeshare developers, like Wyndham, grave harm.

6.       These timeshare exit businesses typically demand exorbitant up-front payment from consumers, and then do little or nothing on behalf of the consumer, often leaving the consumer with ruined credit.  To make matters worse, many consumers that may have an issue with their timeshare product could have the issue resolved by simply contacting the timeshare developer, such as Wyndham, directly or utilizing one of the many programs created by the timeshare industry for consumers, such as the Wyndham Ovation® program.

7.       Defendants, acting in concert, have engaged in a scam to take advantage of timeshare owners and cause Wyndham, its business, and its established brand millions of dollars in damages.  Defendants maliciously and purposefully act, using shell companies and websites, as well as lawyers and sham law firms that are really lawyer referral services and are improperly related to non-lawyer 'marketing' firms, to divert or to otherwise hide, and abscond with funds from consumers that own Wyndham timeshare products ("Wyndham Owners") and interfere

with the current and prospective contractual relationships between Wyndham Owners and Wyndham.

8. Defendants engage in extensive and prolific false advertising, make untrue statements and deceptively misleading empty promises, and guarantee success or specific results that they cannot – and do not – deliver to unsuspecting timeshare owners (including Wyndham Owners), all the while surreptitiously extracting exorbitant, unwarranted fees for illusory services – fees that otherwise would have been used to pay Plaintiffs for amounts legitimately owed to them.

9. Defendants' misdeeds and practices have caused significant financial and reputational damage to Wyndham. In addition to lost revenues, Wyndham is further damaged by the loss of goodwill to its customer base whom may be required to pay more maintenance and/or annual fees than contemplated due to non-payment by others, and tarnishment of Wyndham's reputation and brand, as well as lost revenue associated with the loss of repeat business, referrals, and upgrades by existing Wyndham Owners, and the costs, losses, and fees related to the substantial resources utilized and expended to address the results of Defendants' actions.

10. Wyndham has no other option but to actively and aggressively seek justice for itself, as well as injunctive relief to thwart Defendants from inflicting further and ongoing damage to Wyndham's business and, most importantly, its relationships with Wyndham Owners.

      **B.**    **OVERVIEW OF THE COMPLAINT**

11. In pursuing its legal and equitable remedies here, Wyndham is vindicating its own rights in response to the ongoing damage being done to it by Defendants, which has culminated in millions of dollars of lost revenue. Further, as a concomitant effect, Wyndham is also protecting from further harm the Wyndham Owners, and timeshare owners at large, who have

been negatively impacted by Defendants' wrongful conduct, and otherwise positively impacting the timeshare industry.

12.     Wyndham institutes this action to halt the Defendants' misconduct, recoup its damages, preserve its goodwill in its customer base and brand strength, and to deter future improvident conduct against Wyndham and the Wyndham Owners, whose relationships with Wyndham are being decimated as a direct result of Defendants' nefarious and unlawful actions.

### C.  PARTIES, JURISDICTION, AND VENUE

#### a.  The Plaintiffs

13.     Plaintiff Wyndham Vacation Ownership, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

14.     Plaintiff Wyndham Vacation Resorts, Inc. is a corporation organized and existing under the laws of the State of Delaware with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

15.     Plaintiff Wyndham Resort Development Corporation is a corporation organized and existing under the laws of the State of Oregon with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

16.     Plaintiff Shell Vacations LLC is a limited liability company organized and existing under the laws of the state of Arizona with a principal place of business located at 6277 Sea Harbor Drive, Orlando, Florida 32821.

#### b.  The Defendants

17.     USCA is a professional corporation organized and existing under the laws of the state of Florida with an alleged principal address at 6586 Hypoluxo Road, Suite 300, Lake

Worth, Florida 33467.  This Court therefore has personal jurisdiction over USCA.  In reality, USCA's main office is located at 1300 North Johnson Avenue, Suite 107, El Cajon, California 92020.

18.     Portner is an individual and an attorney licensed to practice law in multiple jurisdictions, including the state of Florida under Florida Bar Number 883050.  Portner is, allegedly, the principal of USCA and lists his official mailing address with The Florida Bar as being the mailing address for USCA (6586 Hypoluxo Road, Suite 300, Lake Worth, Florida 33467).  Portner is a resident of the state of Florida and Palm Beach County, Florida, as he maintains a home address at 6316 Vireo Court, Lake Worth, Florida 33463.  Portner has claimed, and continues to claim, the Florida Homestead Exemption for the property located at 6316 Vireo Court.

19.     Sussman is an individual who is, and upon information and belief, holds himself out as, the manager of USCA.  Sussman owns a home located at 1744 Eldon Court, El Cajon, California 92020.

20.     Pluto is a corporation organized and existing under the laws of the state of Nevada.  Pluto has represented to the Nevada Secretary of State that its principal address (that is, the address at which its officers may be contacted) is 7065 West Ann Rd, Suite 130-165, Las Vegas, Nevada 89130.  However, according to Google Maps®, 7065 West Ann Rd, Suite 130 is a store operated under the name 'The UPS Store', which provides, *inter alia*, mailbox services.  On information and belief, Suite 130-165 indicates that Pluto merely rents a mailbox at The UPS Store and that this address is not its actual place of business.  Pluto, under the direction and control of Sussman, has registered and/or used numerous domain names including timesharefighter.com, tsrsonline.com, bestresortrentalandsale.com, dumpyourtimesharenow.com,

6

timesharefighter.com, timeshareresalesource.com, and uscalaw.com, which it has utilized in connection with the actions taken by Defendants, in concert, as more fully described below.

21.     1 Planet is a corporation organized and existing under the laws of the state of Nevada.  1 Planet r the Nevada Secretary of State that its principal address (that is, the address at which its officers may be contacted) is 7065 West Ann Rd, Suite 130-165, Las Vegas, Nevada 89130.  This is the same address used by Pluto.  In reality, 1 Planet's actual business address is 1300 North Johnson Avenue, Suite 107, El Cajon, California 92020, the same business address utilized by USCA.  1 Planet is a marketing company that engages in nationwide advertising activities including, *inter alia*, marketing to consumers in the State of Florida.

22.     John Does #1-40 are presently unknown affiliates and/or subsidiaries of 1 Planet. As detailed further below, Sussman (along with Portner) engage in substantial deceptively misleading online advertising in order to 'downrank' or otherwise bury or hide damaging stories about them.  Many of these marketing campaigns include YouTube videos that appear to be PowerPoint presentations.  Some of these presentations are also maintained on the website issuu.com ("Issuu"), which "gives anyone with digitally bound content the ability to upload and distribute their publications worldwide."[1]    One such presentation is located at https://issuu.com/robertsussman/docs/renting_and_selling_a_timeshare_mad.  The sixth slide of the presentation located at that website states, in part, "[t]he 1 Planet Media experts operate on the network with an adequate mix of Internet Marketing, with 40 subsidiaries, and many websites."  John Does #1-40 are these 40 subsidiaries advertised by Sussman's Issuu account as working with 1 Planet to engage in the activities described hereinbelow.  The true identities of

---

[1] https://issuu.com/about (last accessed Aug. 31, 2018).

these 40 subsidiaries are unknown and cannot reasonably determined at this time without the use of the Court's subpoena power.

23.     Similarly, John Does #41-50 are the "many websites" advertised on Sussman's Issuu account as working with 1 Planet to engage in the activities described herein below.  The true identities of these 40 subsidiaries are unknown and cannot reasonably determined at this time without the use of the Court's subpoena power.

24.     Newton Group is a limited liability company organized and existing under the laws of the state of Michigan with an alleged principal address located at 250 Monroe Avenue NW, Suite 400 PMB #6026, Grand Rapids, Michigan 49503.  In reality, Newton Group operates out of facilities located at 1750 E Northrop Boulevard, Suite 170, Chandler, Arizona 85286.

25.     Newton ESA is a limited liability company organized and existing under the laws of the state of Michigan with an alleged principal address located at 3148 Plainfield Avenue NE, Suite 283, Grand Rapids, Michigan 49525.

26.     DC Law is a limited liability partnership organized and existing under the laws of the District of Columbia, with a principal address located at 700 12th Street NW, Suite 700, Washington, D.C. 20005.

### c.  Subject Matter Jurisdiction

27.     This Court has subject matter jurisdiction over the claims sounding in the Lanham Act alleged herein pursuant to 28 U.S.C. §§ 1331 and 1338.  This Court has subject matter jurisdiction over the claims sounding in state law alleged herein pursuant to 28 U.S.C. § 1367 as the state law claims are so related to the Lanham Act claims that they form part of the same case or controversy.

### d. **Personal Jurisdiction**

28.     This Court has personal jurisdiction over the Defendants for the following reasons:

a.     over USCA as it is organized and existing under the laws of the State of Florida and directed its representation letters to Wyndham in Orlando, Florida;

b.     over Portner as he is a Florida resident claiming the Florida Homestead Exemption;

c.     over Sussman as he claims to be, and holds himself out as, a consultant to USA, an entity organized and existing under the laws of the State of Florida, and because the actions taken by Sussman, as more fully described herein below, are directed at consumers across the country, including consumers in the state of Florida.  The contacts and actions described herein below, including, without limitation, the active management and running of a Florida-based business, are not isolated or limited, and are purposefully directed towards consumers in the state of Florida;

d.     over Pluto because it is the registered owner of a number of domain names through which all Defendants operate, including, without limitation, uscalaw.com, which directs consumers to USCA's main website, these actions are purposefully directed towards consumers in the State of Florida and cause the repeated, and not limited, transmission of files over the Internet into and out of the state of Florida;

e.     over 1 Planet because it is a nationwide marketing company acting in concert with, controlled by, and working on behalf of, the other Defendants which regularly markets to consumers in the State of Florida; these actions are

9

purposefully directed towards consumers in the State of Florida and are regular and recurring;

f.        over John Does #1-40 as they are subsidiaries of, and outlets through which, 1 Planet operates and are therefore engaged in the same targeting of Florida consumers, and same communications in to and out of the State of Florida, as 1 Planet;

g.        over John Does #41-50 as they are subsidiaries of, and outlets through which, 1 Planet operates and are therefore engaged in the same targeting of Florida consumers, and same communications in to and out of the State of Florida, as 1 Planet;

h.        Over Newton Group as it directs representation letters to Wyndham in Orlando, Florida;

i.        over Newton Group and Newton ESA as they are actively engaged in marketing and selling to residents of the State of Florida and actively solicit business in the State of Florida, and do in fact conduct business with residents of the State of Florida; and

j.        over DC Law as it directed its representation letters to Wyndham in Orlando, Florida, is actively engaged in marketing and selling to residents of the State of Florida and actively solicit business in the State of Florida, and does in fact conduct business with residents of the State of Florida.

29.    For the foregoing reasons, the Court has personal jurisdiction over all Defendants.

### e.  Venue

30.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. §1391 because, as described herein, a substantial part of the events giving rise to Plaintiffs' claims occurred in Florida, the ultimate entity through which Defendants ultimately harm the consuming public and Wyndham is USCA, a Florida-organized and Florida-based entity that resides in this District, and Defendants' conduct giving rise to the claims set forth herein occurred in this District

### f.  Conditions Precedent, Attorneys' Fees

31.     All conditions precedent to the bringing and maintenance of this action have been performed, were waived, would be futile if attempted, or have otherwise been satisfied or occurred.

32.     Wyndham has retained the services of the undersigned lawyers to represent it in this matter and have obligated themselves to pay reasonable attorneys' fees, which fees are recoverable against Defendants pursuant to 35 U.S.C. § 1117 and other statutes, as set forth in greater detail herein.

### D.  NATURE OF THE ACTION

33.     This Complaint requests damages and injunctive relief for violation of the Lanham Act 15 U.S.C. § 1125(a)(1) prohibiting misleading and false advertising, Intentional Interference with Contractual Relations, Intentional Interference with Advantageous Business Relationships/Prospective Economic Advantage, Civil Conspiracy, and violation of the Florida Deceptive and Unfair Trade Practices Act.

### E.  THE WYNDHAM ENTITIES

34.     Wyndham is a global leader in the hospitality and vacation ownership industry with properties and a network spanning the world.

35.     Wyndham Vacation Ownership, Inc. is the parent company or ultimate parent company of three entities that conduct timeshare sales and development activities throughout the United States: Wyndham Vacation Resorts, Inc., Wyndham Resort Development Corporation, and Shell Vacations LLC.

36.     Wyndham devotes substantial resources to advertising and other marketing promotions in an effort to maintain and enhance the value of their established and famous brands.

37.     As part of its business, WVR, WRDC and SV enter into timeshare contracts with consumers (e.g., the Wyndham Owners).  At the time owners purchase timeshares from WVR, WRDC, and/or SV, the owners execute Contracts for Purchase and Sale wherein the owners agree to pay an amount certain for the timeshare interest, as well as maintenance and/or annual fees to the Plaintiffs for the upkeep of the timeshare units and common areas of the timeshare properties. In addition, the owners agree to pay a pro-rated share of the property taxes to Plaintiffs which is then submitted by Plaintiffs to the appropriate local tax collectors.   Often, if a purchaser desires mortgage financing, he or she may apply for a mortgage, and after approval, may execute a Promissory Note and Mortgage, which are referenced and incorporated in the Purchase Agreement.   These timeshare contracts are legally binding contracts and, after the passage of a statutory rescission period, cannot be unilaterally rescinded.

38.     Wyndham Hotels and Resorts, LLC ("WHR", f/k/a Wyndham Hotels and Resorts, LLC and formerly a sister company to WVO), owns, maintains and manages a portfolio of Wyndham related intellectual property.   These intellectual property assets are utilized to market

the Wyndham brand.  Wyndham devotes significant resources to advertising and other marketing promotions to maintain and enhance the value of its brands.  Wyndham has made and continues to make ongoing financial investments in the development and improvement of its products and services, and, further invests resources to preserve and enhance its brand value and the goodwill associated with its products and services.  Indeed, visibility and recognition of its brand products and services is a key component to Wyndham's business model.  Wyndham competes directly with other marketers of resort products who share a similar consumer base.

### F.  THE THIRD PARTY EXIT COMPANY ("TPE") SCAM

39.     Following the late 2007 recession, a small group of individuals hatched a plan to unscrupulously prey on timeshare owners affected by the economic downtown.     These individuals seek economic gain at the expense of timeshare owners and timeshare developers, like Wyndham.  Developers, such as Wyndham, are specifically targeted due to their size, the sheer number of Wyndham Owners, and number of Wyndham branded and managed properties throughout the U.S. and abroad.

40.     These individuals, working together, have formed a relatively new underground sub-industry dubbed "third party exit companies" or "TPEs", "PPEs", or "affiliates".

41.     These various individuals and their TPEs, saw an opportunity to make fast cash from those suffering from the aftermath of the late 2007 recession and without the means to make regular timeshare payments.

42.     Although there are variations of the TPE scam, the TPEs (often owned and managed by unsavory individuals) offer and allegedly provide timeshare interest "transfer" and/or "exit" (i.e. termination of existing contracts) services with respect to consumer resale of timeshare interests in timeshare properties.

43. Through various forms of deceptive advertising, including, without limitation, direct mailings and other communications crossing state lines, "data mining" on the internet, as well as inappropriate, unsolicited, direct contact with a timeshare developer's owners, TPEs and/or their marketing firms make false statements about developers and/or the timeshare owners' timeshare interests, provide deceptively misleading information to timeshare owners, and otherwise instruct owners to breach their contracts and stop payments on their timeshare agreements and/or maintenance fees, many times through creative "talking points" luring these individuals to act through a "pitch."

44. These TPEs often charge consumers exorbitant upfront fees while failing to disclose to consumers what, exactly, the timeshare exit company will do for the consumer. In fact, TPEs frequently mislead consumers, either through blatantly false statements, or statements that, while potentially literally true, are deceptively misleading or only partially true. For example, timeshare exit companies frequently state or imply that they have some sort of 'method' or 'special method' to assist consumers in 'exiting' their timeshare contracts. TPEs also frequently state or imply that consumers need to retain them because of their 'method' and that it will provide consumers with an advantage of some type in attempting to cancel their timeshare contracts. More specific examples of Defendants' false and/or deceptively misleading statements are detailed herein. In reality, these TPEs have no method of helping consumers exit their timeshare contracts as no such method exists separate and apart from any program a timeshare company may choose to offer direct to consumers.

45. What these companies frequently do is fail to disclose to the consumers that they will, in fact, do very little, if anything, for the consumer and frequently force the consumer's timeshare interest into default and eventually foreclosure, after which the TPE claims that it

14

helped the consumer "exit" their timeshare contract. Frequently, the consumer is not aware that their timeshare interest was actually foreclosed and their credit rating adversely impacted. In sum, consumers are persuaded to pay TPEs for illusory services.

46.     Another frequent variation of the TPE scheme is to fraudulently transfer a customer's timeshare interest via quitclaim deed, or other instrument that has not been approved by the timeshare developer, to a third-party or strawman buyer who then fails to make payments on the timeshare interest as required. Because the transfer was not approved, the resort developer looks to the original owner of the timeshare interest for payment while the original owner is completely unaware that they are still the legal owner of their timeshare interest.

47.     For illustrative purposes, a common form of the TPE scheme works as follows. The timeshare exit company solicits timeshare owners, promising that the timeshare exit company can help the timeshare owner 'effectively' or 'legally' exit their timeshare contract. The timeshare exit company extracts an up-front payment (sometimes financed over time by the timeshare exit company itself) from the consumer. The timeshare exit company then uses an attorney to send a demand letter to the timeshare company – this attorney is retained directly by the timeshare exit company, *not* the consumer, but purports to represent the consumer. The demand letters usually state that the consumer wishes to cancel their timeshare, sometimes cite to irrelevant legal decisions, and tell the timeshare developer not to contact the consumer. Sometimes the demand letters reference the Fair Debt Collection Practices Act to further prevent any communication from the timeshare developer to the timeshare owner. Simultaneously, the timeshare exit company directs the timeshare owner not to speak to the timeshare developer, make no further payments on any outstanding loans and/or not to pay maintenance fees. Thus, the timeshare exit company has prevented the timeshare developer and timeshare owner from

communicating with each other while directing the timeshare owner to take actions that will result in the timeshare owner defaulting on their timeshare contract and, eventually, a foreclosure of that interest. After the foreclosure, the timeshare exit company will claim it helped the consumer 'exit' their timeshare contract and refuse to refund any monies pursuant to the guarantees that were made to the consumer. USCA and DC Law engage in this type of scheme.

48. In sum, these TPEs charge timeshare owners exorbitant fees under the auspices that they will get them out of their timeshare contracts, but the services are illusory. They usually target large timeshare developers, like Wyndham, using unsuspecting timeshare owners as a vehicle to damage Wyndham.

49. Ultimately, not only is the developer's relationship with its owners irreparably damaged, through the loss of goodwill and brand damage, but these developers are dramatically financially impacted by the loss of millions of dollars. As for the timeshare owners, they may face the loss of the monies paid, the loss of their timeshare interests through foreclosure, and/or significant negative impact on their credit, amongst other things. This odious misconduct has been historically insulated from attack, using shell companies or other similar scams. In many instances, once the TPE is shutdown via court intervention, a "new" TPE with the same principals is created and put in action.

50. Over the past decade, these TPE scams have refined their trade and the sub-industry has reached new heights and new level of damages.

51. TPE scams exist for the sole and improper purpose of inducing consumers, including, without limitation, Wyndham Owners, to breach their valid, binding timeshare agreements with Wyndham, thereby defrauding and harming the consuming public, including, without limitation, Wyndham Owners.

52.    Defendants are one such TPE scam, as set forth in greater detail herein.  For ease of reference, an Organizational Chart showing the inter-relationship amongst the Defendants is annexed hereto as Exhibit 1.

## G.  USCA – A PURPORTED LAW FIRM

53.    Unlike some other timeshare exit companies, USCA bills itself, and is apparently organized as, a law firm.  However, as set forth hereinabove, USCA is apparently managed and/or run, at least in part, by Sussman, a non-lawyer and is directly linked with Pluto and 1 Planet, non-law firm entities which 'feed' clients to USCA, advertise on behalf of USCA, and own various USCA-linked assets.

54.    USCA is actually co-located with Sussman's marketing companies (1 Planet and Pluto, and potentially their subsidiary entities), accepts illegal and improper referrals from these marketing companies, and splits fees with non-lawyer entities, violating various state bar rules, including, without limitation, Florida Bar Rule 4-7.22 regarding 'Qualifying Providers, Lawyer Referral Services, Matching Services, Group or Pooled Advertising, Directories, and Tips or Lead Generators'.  USCA's advertising is false and deceptively misleading, and violates various state bar rules, including, without limitation, Florida Bar Rule 4-7.13 regarding 'Deceptive and Inherently Misleading Statements'.

55.    Portner and Sussman have a long history together.  They have been – individually or together – parties to various lawsuits regarding their timeshare exit and advertising activities. Portner, individually, has been sanctioned twice by the Florida Bar and once by the United States Patent and Trademark Office for improper advertising practices and failing to properly represent clients.

56.     Based on the various links between Portner, Sussman, and their various companies, it is unclear whether USCA is actually a law firm, a lawyer referral source, a lawyer directory, a combination of the foregoing, or something else entirely.  This is because, in addition to the apparently illegal or otherwise improper arrangement of having a non-lawyer with management authority over, and apparent profit-sharing in, a law firm, Defendants engage in a number of practices that appear to be incompatible with a law firm, and that are false and/or deceptively misleading, such as:

      a.  offering guaranteed results (*see* Exhibit 2 annexed hereto);

      b.  running advertisements that have, upon information and belief, not been submitted to The Florida Bar (*see id.*);

      c.  failing to disclose a 'home office' and locations where services are rendered;

      d.  not disclosing who their attorneys are and telling consumers that they will simply be assigned an 'experienced timeshare attorney' with a hyperlink that redirects consumers to USCA's homepage, www.usconsumerattorneys.com (*see* Exhibit 3 annexed hereto);

      e.  claiming as 'our lawsuits' civil actions that were filed, apparently, by law firms other than USCA, such as Case No. A-17-762690-C, currently pending in the United States District Court for the District of Nevada;

      f.  utilizing strawmen and other companies (such as Sussman, Pluto, 1 Planet, and their related companies and websites) to engage in advertising activities; and

      g.  making illusory promises to the consuming public, including Wyndham Owners, in that the retainer agreements Wyndham Owners sign with USCA do not actually require USCA to perform any work or services, and permit USCA to simply take

money for consumers for doing absolutely nothing (USCA has, in fact, been sued in bankruptcy court for this very practice).

## H. **LINKS BETWEEN SUSSMAN COMPANIES AND PORTNER AND USCA**

57.     As set forth above, there are a number of links between Sussman's companies (1 Planet, Pluto, and their various subsidiaries) and USCA.  Those links are as follows.

58.     Sussman previously had a company named Nevada National Advertising, Inc. ("NNA"), which was a marketing company serving the timeshare exit industry.  Portner was also involved with NNA in various capacities, including as an attorney working on behalf of NNA. Like the Defendants in this civil action, NNA was co-located with some of Portner's entities, including USCA.

59.     NNA was eventually closed after lawsuits were filed against it (and, in some instances, Sussman and/or Portner) and  claims successfully prosecuted.

60.     Sussman holds himself out to the world as an expert in marketing.

### a.      **The Websites**

61.     Defendants have registered and used numerous domains names in an effort to hide their identities and interlinks, maximize their advertising reach and online advertising ranks, to lure as many customers as possible into their scheme, and to harm Wyndham.  On information and belief, through Sussman and Portner's control, Pluto and 1 Planet have registered a number of domain names, but done so using tools to shield their identify.  However, Defendants allowed the privacy shield to expire on some of those domains.

62.     One of the domain names where Defendants allowed the privacy shield to lapse is the domain <uscalaw.com>.  <uscalaw.com> automatically redirects consumers to USCA's main website, located at www.usconsumerattorneys.com.  *See* Exhibit 4 annexed hereto.

19

<uscalaw.com> was previously registered behind a privacy shield but is no longer so protected. A copy of the Whois history for <uscalaw.com> is annexed hereto as Exhibit 5. The Whois history shows <uscalaw.com> was registered by Pluto Marketing, 7065 West Ann Road, Suite 130-165, Las Vegas, Nevada 89130 by a person using the email address sschwarz@lveas.com.

63.     The domain name <lveas.com> automatically redirects users to the domain name <lasvegaseventsandshows.com>, the website for Las Vegas Events and Shows ("LVEAS"). *See* Exhibit 6 hereto. Las Vegas Events & Shows is a mark registered in the State of Nevada (*see* Exhibit 7 hereto), registered to Nevada Magazine, 401 North Carson Street, Carson City, Nevada 89701. Sussman was the online publishing partner of the magazine and owner of the domain <lasvegaseventsandshows.com>. A copy of a masthead from Nevada Magazine showing the relationship is annexed hereto as Exhibit 8.

64.     It is therefore clear that Pluto, at the direction and control of Sussman and in conjunction with Portner and USCA, owns the domain <uscalaw.com>, which, together with Portner and USCA, has been set to automatically direct consumers to USCA's website, www.usconsumerattorneys.com.

65.     <uscalaw.com> is hosted on a computer or device utilizing the Internet Protocol ("IP") address 64.50.173.131, located in California. *See* Exhibit 9 hereto.

66.     The subnet for that IP address (that is, all IP addresses in the range of 64.50.173.1-254) hosts a number of domain names that are related to the Defendants. *See* Exhibit 10 hereto.

67.     Wyndham has been able to determine that Pluto is the owner of at least the following timeshare-related domain names:

    a.   <timesharefighter.com>;

     b.   <tsrsonline.com>;

     c.   <bestresortrentalandsale.com>;

     d.   <dumpyourtimesharenow.com>;

     e.   <pacificmonarchabankruptcy.com>; and

     f.   <timeshareresalesource.com>.

68.    <bestresortrentalandsale>,             <dumpyourtimesharenow.com>, <pacificmonarchbankruptcy.com>, <timesharefighter.com>, and <tsrsonline.com> are all hosted on a computer or device utilizing the same IP address: 64.50.173.124, located in California.  *See* Exhibit 11 hereto.  The domain <nevadanationaladvertising>, the domain for NNA, is also hosted at that same IP address.  *Id*.

69.    Pluto Marketing, utilizing the same sschwarz@lveas.com, is listed as the owner of the following of the aforementioned domains: <tsrsonline.com>, <dumpyourtimesharenow.com>, <timesharefighter.com>, and <timeshareforadollar.com> (in addition to <uscalaw.com>).  A copy of the Whois information for these domains is annexed hereto as Exhibit 12.

70.    It is therefore clear that Pluto, at the direction and control of Sussman and in conjunction with Portner and USCA, owns and operates at least the foregoing domain names.

71.    Upon information and belief, Sussman and Portner, through USCA, Pluto, and 1 Planet (or a combination of the three), have used a single web host to host webpages on each of these domains.  Those web pages are intentionally designed to infringe upon Wyndham's intellectual property rights and engage in false advertising activities.

72.    Those webpages presently host webpages that are clearly involved in the timeshare exit business.

73.     www.dumpyourtimesharenow.com,     the     webpage     hosted     at <dumpyourtimesharenow.com> ("Dump Your Timeshare") is an obvious timeshare exit business and is clearly and obviously linked with USCA.

74.     Dump Your Timeshare hosts a 'wall of fame' page, where 'successful timeshare cancellation'     letters     are     displayed.     This     page     is     located     at http://dumpyourtimesharenow.com/successful-timeshare-cancellations.php#letters.

75.     The Dump Your Timeshare 'wall of fame' page shows that Dump Your Timeshare targets Wyndham owners.  There are at least two Wyndham related letters on the 'wall of fame'.

76.     While Dump Your Timeshare attempts to redact all information regarding the businesses and/or lawyers allegedly representing the consumers referenced therein, it appears that at least the following lawyers are listed as having worked with Dump Your Timeshare:

      a.  Portner (working with NNA); and

      b.  Mitchell Reed Sussman, Robert Sussman's brother, and notorious timeshare exit lawyer.

77.     Dump Your Timeshare is clearly and obviously linked to USCA.  Dump Your Timeshare hosts a 'video' (really, a slideshow) at http://dumpyourtimesharenow.com/timeshare-cancellation-presentation.php (the "DYT Video").

78.     USCA     also     hosts     a     'video'     (really,     a     slideshow)     at https://usconsumerattorneys.com/video/ (the "USCA Video").

79.     The DYT Video and USCA Video are very similar and, in various aspects, identical, in many ways, including, without limitation, the following:

      a.  they are narrated by the same person;

    b.   they are both approximately 24 minutes in length;

    c.   they are both videos that are a series of slides;

    d.   after a customized introduction, both show the following slide:



    e.   both then show the following slide:



    f.   both videos show the following slide to give the impression that after a timeshare interest is foreclosed upon, there will be mandatory garnishments and deficiency judgments against the consumers, which is not true as many states (including Florida) have laws that prohibit deficiency judgments in timeshare foreclosures:






;

    g. using identical examples (six in total), in the same order, of 'Recent Special Assessments';

    h. both show the following slide, which is false and/or deceptively misleading because the Defendants are not selective and will accept any person as a client:





    i. while showing the slides in subparagraph h, above, both videos claim their respective companies have a "100% success rate", which is false and/or deceptively misleading because they do not have a 100% success rate as many of their customers have their timeshare interests defaulted, cancelled, forfeited, and/or foreclosed upon, which no reasonable consumer would consider a 'success' as anybody can default on a payment obligation by simply not paying

(meaning there is no reason to pay a third party thousands of dollars to default on a payment obligation);

j.  they both show the following slides, showing just how deceptive Defendants are, as the 'process' utilized by Dump Your Timeshare (which is not a law firm) and USCA (which ostensibly is a law firm) is *identical*, with the exception of Dump Your Timeshare using a "fully licensed specialist" while USCA utilizes an "experienced USCA Attorney",









k.  a series of six slides allegedly showing examples of letters received by clients of Dump Your Timeshare (DYT Video) or USCA (USCA Video) 'releasing' the

customer of their timeshare obligations, the first five slides, and the letters they show, are identical, showing letters from the following timeshare companies in this order: Wyndham Vacation Resorts, Bluegreen Resorts, Hilton Grand Vacations, and Woodstone at Massanutten; these letters are false and/or deceptively misleading because a consumer cannot be a customer of both Dump Your Timeshare and USCA, yet these letters are presented as actual results obtained by each organization (which is not true) and thus amount to false endorsements, additionally, the USCA Video does not contain the necessary disclaimers required by the Florida Bar (and other state bar associations) and therefore violates the Rules Regulating the Florida Bar,



;

l.   Dump Your Timeshare regularly refers to itself in the DYT Video as "U.S. Consumer Associates" both in the voiceover on the DYT Video and in a watermark in the bottom right hand corner of each slide of the DYT Video, which has the same acronym – USCA – as Defendant, USCA, this leads to false and/or deceptively misleading slides such as the following, where Dump Your Timeshare states that the fee a consumer pays to Dump Your Timeshare covers

26

'as many hours as it takes' of 'legal research and preparation' and 'filing lawsuits if necessary',

; and

m. both videos steal text from the website http://tcpaa.org/government-consumer-protectorates-advisement/, the two videos then misquote the source (which is itself a misquote of the original article from the July 2011 edition of *The Costco Connection*, a copy of which is annexed hereto as Exhibit 13), which is false and/or deceptively misleading,[2]

---

[2] The TCPAA, which the two videos allege is a 'consumer protection organization' is nothing of the sort.  It is actually an advertising front for The Abrams Firm, a timeshare exit 'law firm' in Olympia-Lacey, Washington run by John Phillip Abrams.







;

### b. The Call Center

80.     Additionally, Defendants are interlinked by another of Sussman's companies, 1 Planet.

81.     1 Planet is co-located in the same office as USCA.

82.     1 Planet engages, at least, in the business of telemarketing solicitations. An example resume found for a former employee of 1 Planet is annexed hereto as Exhibit 14.

83.     Upon information and belief, 1 Planet engages in these call center activities at the direction, behest, and for the benefit, of USCA. Alternatively, some combination of 1 Planet,

Pluto, and/or USCA engages in direct telephone marketing (a/k/a "cold calling") to consumers, including Wyndham Owners.

### c.  Other Referral Sources

84.  USCA also receives referrals from other sources, which sources engage in advertising that would be unethical for a lawyer to conduct.

85.  Newton Group is a TPE that bills itself as "The #1 Trusted Timeshare Exit Company" and "The #1 Trusted Name In Timeshare Exit". *See* http://newtongrouptransfers.com.

86.  Newton Group has a related company, Newton ESA which is a marketing company (similar to 1 Planet and Pluto).  The "ESA" in Newton ESA's name stands for "elite sales associates".

87.  Newton ESA advertises that it provides the following services:



Newton Group, and other, presently unknown timeshare exit companies, utilize Newton ESA's services to market to consumers.

88.     Newton ESA utilizes phone agent cold calling, phone agent lead cultivation, voice mail marketing, form emails, fax blasting, text messaging, and direct mail techniques.  Examples of some of Newton ESA's direct mailings are annexed hereto as Composite Exhibit 15.  These mailings are false and/or deceptively misleading.

89.     One of the letters Newton ESA sends on behalf of Newton Group (or that Newton Group sends on its own behalf) states the following

We are attempting to contact you because our records suggest that you are an owner who may be affected by new Timeshare Laws allowing developers to raise maintenance fees with no restriction. These new laws may also make it more difficult for owners such as yourself to get rid of your timeshare.

Let us help.

This advertisement is false and/or deceptively misleading as there are no "new Timeshare Laws" that "allow[] developers to raise maintenance fees with no restriction."  This advertisement is designed solely to lie to the consuming public, including Wyndham Owners, and induce them to attend a meeting hosted by Newton Group.

90.     Other advertisements utilized by Newton ESA and Newton Group (and other, as yet unknown timeshare exit companies), falsely imply they are from some type of governmental or other official agency.  These mailings claim to come from the 'Accounting Division' of 'Consumer Protection US', utilize a seal that is designed to mimic seals used by governmental organizations, and purport to be sent by "Mark Tyler Settlement Official Agent No. 46211", an individual that does not exist.

91.     The purpose of Newton Group and Newton ESA's false advertisements is to trick the consuming public, including Wyndham Owners, in to retaining Newton Group's illusory timeshare exit services.

30

92.     Newton Group offers two types of timeshare exit services: the 'timeshare transfer exit' and the 'timeshare attorney exit'.

93.     The Newton Group 'timeshare transfer exit' purports to be a process by which a timeshare interest is transferred from a consumer without the use of an attorney.  What Newton Group actually does is engage in fraudulent deed transfers, using quit claim deeds (or other deeds that have not been countersigned by the timeshare company) to transfer the timeshare interests from the consumers to a strawman buyer, who then defaults on payments and suffers a mass foreclosure.  Additionally, Newton Group falsely advertises their 'skin in the game guarantee' whereby Newton Group states that a consumer will never pay Newton Group or the timeshare company any more money because Newton Group will become "financially responsible for your timeshare until it is out of your name" and that this is important because "[i]n this way, our goals are aligned. The longer it takes us to complete the transfer process, the more it cost us in fees to the resort. Both company and client want to see an expedient end to your timeshare ownership." In reality, many consumers, including Wyndham Owners, have gone into default on their accounts because Newton Group does not assume financial responsibility for the timeshare interest and does not make required payments.

94.     The Newton Group 'timeshare attorney exit' is essentially an illegal and improper attorney referral scheme.  Newton Group advertises that

**If you do need an attorney, Newton Group Transfers will hire you an experienced timeshare exit attorney and back your legal representation with the following Newton Group Guarantees:**

***Our Representation Guarantee.*** Newton Group Transfers will hire an experienced timeshare exit attorney to represent you, the timeshare owner. Some companies state that they have "attorneys on staff" but those attorneys would not represent you. When we hire an attorney for you, they will represent you and your interests. You will receive a letter of representation to confirm that the attorney is in fact representing you.

**Our "One Flat Fee" Guarantee.** With a timeshare exit, the number of hours involved is unknown, which could leave you exposed to outrageous legal fees if billed by the hour. Having one all-encompassing fee assures you that your attorney is aligned with your goal of ending your timeshare ownership as soon as possible. Furthermore, this will guard against any additional legal fees in the event of litigation with the resort. Keep in mind, you could still be subject to additional settlement fees from the resort.

**Our 100% Money Back Guarantee.** If the attorney we hire to represent you fails to either provide an exit solution or settlement agreement, Newton Group Transfers will return ALL of your money.

95.     Newton Group refers consumers to USCA and DC Law, which then carry on the scheme as set forth in this Complaint.   These referrals are a direct result of the false and deceptively misleading advertising engaged in by Newton Group and Newton ESA as set forth in the preceding paragraphs.   USCA and DC Law pay for these false advertising services either through direct payments and/or allowing Newton Group and Newton ESA to keep a portion (frequently a substantial portion) of the fee paid to Newton Group by a consumer.

**d.   Additional Advertisements**

96.     Defendants are engaged in a variety of additional false and/or deceptively misleading advertising activities.

97.     USCA engages in Search Engine Optimization designed to increase its 'page rank' in searches and increase its exposure.   In order to do this, USCA utilizes metadata, coding, utilizing numerous other websites to promote USCA, and backlinking.   Presently, there are approximately 269 backlinks that are designed to increase the profile of USCA.

98.     The USCA Defendants (USCA, Portner, Sussman, 1 Planet, and Pluto) purchase a substantial number of Google AdWords® to promote USCA.   The USCA Defendants purchase 29 AdWords® utilizing 'Wyndham', 7 AdWords® for 'Worldmark', and 2 AdWords® for

'Shell' on the desktop platform.  The USCA Defendants purchase additional AdWords® for use on mobile platforms.  These AdWords®, and the advertisements they trigger, are shown on Composite Exhibit 16.  These ads are false and/or deceptively misleading as they repeatedly make statements like:

> a. "Guaranteed Timeshare Exit – Legally Exit Your Timeshare" (the USCA Defendants cannot legitimately guarantee an exit and it is deceptively misleading as a foreclosures, forfeitures, and defaults are technically 'guaranteed' methods of 'exiting' a timeshare contract, though no reasonable consumer would ever pay thousands of dollars to achieve a result – foreclosure – they could achieve on their own by simply ceasing payments);
>
> b. "Forced & Tricked in[sic] Buying a Timeshare & Want Out?" (the USCA Defendants imply that timeshare companies are engaged in criminal activities, when combined with the USCA Defendants' various websites and other marketing (including, without limitation, Newton Group and Newton ESA), the USCA Defendants deceptively mislead consumers into believing that completely legal business practices are somehow illegal, misleading consumers into retaining the USCA Defendants);
>
> c. "Scammed Into a Timeshare?  - Exit Your Timeshare Contract." (a variation on subparagraphs (a) and (b) above); and
>
> d. "Top-rated Program" (there are no such ratings), a false and/or misleading advertisement that Newton Group and Newton ESA also engage in.

99.    The USCA Defendants make the following false and/or deceptively misleading statements on the USCA website:



*Eliminate Timeshare Contracts Easily*

## Did your Timeshare Salesperson:

» Present the membership offer to you for more than 90 minutes?
» Invite you to a free gift, trip, meal or event, which turned into a sales pitch?
» Tell you that the timeshare would go up in value over time?
» Claim that you could sell and/or rent your timeshare whenever you wish?
» Promise that they would buy it back from you if desired?

This is where US Consumer Attorneys comes to the rescue! These are unethical tactics and are considered coercive, and some of them are even fraudulent. If you were subjected to such treatment, your timeshare company can be held legally accountable.

Timeshare resort companies cannot legally use high-pressure tactics to force you to buy a timeshare membership. Many timeshare companies use lies, intimidation and fraudulent claims, which is illegal. US Consumer Attorneys demands that they cancel your timeshare contract, permanently. We'll Beat Any Price for Paid in Full Timeshare Transfers!

Contact Us now to **Cancel your Timeshare Contract**.

100.    None of the 'tactics' listed on the website are unethical or 'considered coercive' or 'fraudulent' and none are legitimate grounds for legally terminating a timeshare contract.

101.    USCA maintains a webpage dedicated to attacking Wyndham and making false and/or deceptively misleading statements about Wyndham to the consuming public, located at https://usconsumerattorneys.com/wyndham-resorts-timeshare.php.    This webpage makes a number of false and/or deceptively misleading statements, including that the USCA Defendants have a "proven, results-driven timeshare cancellation program" (forcing consumers into foreclosure is technically proven, results-driven, and a method of cancelling a timeshare contract,

but no rational consumer would pay a third-party for a foreclosure, a remedy they could garner themselves and for free), that the USCA Defendants "successfully rid timeshare owners of their obligations" (same as the prior statement)

102.    In their marketing videos (as set forth in Paragraph 79), the USCA Defendants represent that they have a 100% success rate and that they "never go to trial", neither of which is true or, if they are true, they are deceptively misleading because the 'success rate' includes foreclosures, which is not a success by any measure.

103.    In fact, the USCA Defendants have admitted that outside of a statutory rescission period, a timeshare contract can only be terminated "[i]n certain states and in limited circumstances" and that this usually entails "bringing a lawsuit against the timeshare company."

**US Consumer Attorney**

## HOW TO CANCEL AFTER THE CANCELLATION PERIOD HAS EXPIRED

- × In certain states and in limited circumstances, you might be able to cancel your timeshare contract after the rescission period has passed.
- × Usually, however, this will entail bringing a lawsuit against the timeshare company. Contact a real estate attorney for advice.

104.    USCA almost never brings lawsuits on behalf of consumers.  Thus, the USCA Defendants know they are falsely advertising to the public – on one hand they tell every consumer that they have a 100% success rate, that they are selective in the cases they take, and that they have a plan and solution for their consumers, but on the other hand they have admitted that they have to bring lawsuits to even attempt to terminate a timeshare contract, an action USCA almost never takes.

105.    The advertisements listed in Paragraphs 56, 72 through 79, and 85 through 104, together, the "False and Misleading Advertisements."

106. None of the Defendants have a 'process' or 'legal' basis for 'cancelling' a consumer's timeshare contract. Defendants, through USCA, Newton Group, and/or DC Law (and potentially other avenues) send form letters to Wyndham with little to no follow-up. Many of these letters are nonsensical, reference non-existent laws, reference irrelevant laws, and admit that the Wyndham Owners will default on their payment obligations. The letters admit that a default will occur because Defendants have instructed the Wyndham Owners to cease making payments and, in fact, have promised the Wyndham Owners that once the Wyndham Owners retain Defendants they (the Wyndham Owners) will never have to make another payment to Wyndham again.

107. When viewed as a whole, the False and Misleading Advertisements are not puffery. Thousands of consumers have fallen prey to Defendants' false and/or deceptively misleading advertisements and have retained Defendants to render them illusory services. While Defendants will undoubtedly claim that no reasonable person would ever rely on their advertisements, such allegations are clearly inapposite and incompatible with the clear facts and reality. Those clear facts show the reality of consumer behavior: thousands of consumers have paid Defendants thousands or tens of thousands of dollars each for Defendants' 'guaranteed', 'safe', 'proven', and 'effective' 'process', only to have their timeshare interests terminated, cancelled, defaulted, and/or foreclosed upon for non-payment. No rational consumer would pay such sums of monies to a third-party to achieve the same results (timeshare termination, cancellation, defaults, and/or foreclosures for non-payment) that they could achieve on their own through the simple act of not paying. Many timeshare owners, including Wyndham Owners, who pay Defendants for their illusory services ultimately suffer the same fate as any other consumer who simply elects not to make payments on their timeshare contracts; the only

difference between many consumers who simply stop paying, and those who retain Defendants' illusory services, is that the later group of consumers lose additional thousands or tens-of-thousands of dollars to Defendants on top of what they lose by defaulting on their payment obligations.  Moreover, many of the False and Misleading Advertisements are considered 'inherently deceptive' by the Florida Bar.

108.  Defendants false and deceptively misleading advertisements cause direct harm to Wyndham.  The False and Deceptive Advertisements make false and/or deceptively misleading statements about both Defendants' products and services, and Wyndham's products and services.  These statements both deceive consumers, including Wyndham Owners, into retaining Defendants' services, but also damage Wyndham's products and services in the eyes of the consuming public.  Defendants exist for the sole purpose of interfering in Wyndham's contracts with the Wyndham Owners.  Because Wyndham Owners can be either a customer of Defendants, or a customer of Wyndham, but not both, they are competitors and there is a direct relationship between Defendants false and/or deceptively misleading advertising and harm to Wyndham in that the False and Misleading Advertisements are solely designed to induce Wyndham Owners into retaining Defendants, who then immediately instruct those Wyndham Owners to cease making payments to Wyndham.

## COUNT I
### Violation of the Lanham Act, 15 U.S.C. § 1125(a)(1) (against all Defendants)

109.  Wyndham adopts and realleges paragraphs 1 through 108 above as if fully set forth herein.

110.  This is an action for violation of the Lanham Act, 15 U.S.C. § 1125(a)(1).

111.  Defendants willfully, deliberately, and egregiously made false or misleading statements of fact in their commercial advertisements and intended to mislead consumers.  The

statements described above and incorporated herein were literally false, either on their face or by necessary implication, as set forth herein.

112.    The representations described above were commercial speech made by a defendant acting in competition to Wyndham by trying to interfere with Wyndham's business relationships for Defendants' own ill-gotten financial gain, for the purpose of influencing consumers to retain Defendants' services, and were disseminated sufficiently to the timeshare owning public to constitute advertising or promotion within the timeshare industry.

113.    Defendants' false or misleading statements either deceived or had the capacity to deceive a substantial segment of the consuming public.

114.    Defendants' deception is material, in that it is likely to influence the consumers' decisions whether to retain Defendants' services or to cease making payments to Wyndham or utilize the Ovation® Program, which is available to assist Wyndham Owners who may wish to exit their timeshare contracts with Wyndham.  Defendants directly lie to the consuming public by ignoring the existence of the Ovation® Program and ignoring the options available to Wyndham Owners, instead telling consumers that Wyndham will do nothing to work with consumers.

115.    Defendants are operating as direct competitors to Wyndham.  Because of the nature of the TPE scams, a consumer can either be a customer of Wyndham or a customer of a TPE entity, but not both.  This is because TPEs exist solely to induce consumers to breach their timeshare contracts, they have no other purpose.  Thus, once a Wyndham Owner enters into an agreement with a TPE, the sole purpose of that agreement is to cause the breach or termination through other means of that Wyndham Owner's agreement(s) with Wyndham, effectively converting that individual from a Wyndham Customer to a TPE customer.

116.    Wyndham has been or is likely to be injured as a result of Defendants' false and/or misleading statements.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Defendants, jointly and severally, for damages, corrective advertising, and disgorgement of Defendants' profits, together with interest thereon, an award of court costs, a determination that the instant civil action is an exceptional case and awarding Plaintiffs their attorneys' fees, entry of preliminary and permanent injunctive relief, and for such other and further relief as the Court deems appropriate.

**COUNT II**
**Tortious Interference with Contractual Relations (against all Defendants)**

117.    Wyndham adopts and realleges paragraphs 1 through108 above as if fully set forth herein.

118.    This is a cause of action for tortious interference with contractual relations.

119.    Wyndham has contractual relationships with its timeshare owners.

120.    Defendants, by virtue of making misrepresentations to Wyndham Owners regarding their contracts and the existence of the Ovation® Program, and options available to them, have knowledge of these relationships.

121.    As set forth herein, Defendants have intentionally procured the breach of these Wyndham contracts by soliciting Wyndham Owners and persuading them to hire Defendants to help cancel (in reality, breach) their contracts. Upon information and belief, Defendants also procure a breach by telling Wyndham Owners to stop paying their timeshare loans and maintenance fees and/or engaging in fraudulent transfers.

122.    Defendants do not have justification or privilege in procuring the breach of such contractual relations, as Defendants are "a stranger to the business relationship" between

40

Wyndham and its customers.  See *Treco Intern. S.A. v. Kromka*, 706 F. Supp. 2d 1283, 1289 (S.D. Fla. 2010) (quoting *Salit v. Ruden*, 742 So.2d 381, 385 (Fla. 4th DCA 1999)).

123.     As a result of Defendants' intentional conduct, certain of the breaching owners have terminated their contractual relationships with Wyndham before expiration of the terms of those contracts. Some of these breaching owners are current on their maintenance fees and would in certain instances keep their timeshare contracts but for Defendants' wrongful actions.

124.     Defendants' ongoing conduct has caused and, if not permanently enjoined, will continue to cause irreparable harm to Wyndham in the disruption of customer and other contractual relations; therefore, Wyndham does not have an adequate remedy at law.

125.     Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request the Court enter final judgment in their favor and against Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of preliminary and permanent injunctive relief, and for such other and further relief as the Court deems appropriate.

## COUNT III
## Violation of Florida's Deceptive and Unfair Trade Practices Act (against all Defendants)

126.     Wyndham adopts and realleges paragraphs 1 through 108 above as if fully set forth herein.

127.     This is a cause of action for damages and permanent injunctive relief under Section 501.211, Fla. Stat.

128.     Wyndham is a legitimate business enterprise under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

129.   Wyndham's owners and prospective owners are consumers for purposes of FDUTPA.

130.   Defendants are engaged in trade or commerce as those terms are defined by FDUTPA.  Defendants are also engaged in timeshare transfer services as defined in Fla. Stat. § 721.05(52) ("Transfer Interest Services").

131.   Defendants have violated Fla. Stat. § 721.17 by failing to comply with the state requirements for the transfer of interest and resale of transfer agreements pertaining to timeshare entities.

132.   Defendants have offered and executed contracts titled "Deed / Title Transfer Service Contract" with multiple Wyndham customers.

133.   In executing these Deed / Title Transfers, Defendants have never established an escrow account with an escrow agent prior to the agreement as required by Fla. Stat. § 721.17(3)(c)(1).

134.   Defendants are engaged in deceptive and unfair practices, including luring unsuspecting timeshare owners into Defendants under false pretenses and using misrepresentations and high pressure sales tactics to convince Wyndham consumers to pay substantial fees to "cancel" their contracts with Wyndham, when, in many instances, cancellation is available to consumers directly from Wyndham at no cost through the Ovation® Program.

135.   Wyndham is a party aggrieved by Defendants' violation of FDUTPA.

136.   Section 501.211(1), Fla. Stat., "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future." *Wyndham Vacation Resorts, Inc. v. Timeshare Direct, Inc.*, 123 So.3d 1149, 1152 (Fla. 5th DCA 2012).

137.     Under Section 510.211(1), Fla. Stat., "anyone aggrieved" includes a broader class of complainants than merely consumers; the scope of the injunctive remedy is also greater than the actual damage remedy under § 510.211(2), Fla. Stat. *Id. See also, Kinger v. Weekly World News, Inc.*, 747 F.Supp. 1477, 1480 (S.D.Fla.1990).

138.     As a result of Defendants' actions, Wyndham has been damaged and aggrieved. Wyndham has suffered a loss, including financial loss, damages to its reputation, and loss of goodwill.

139.     Wyndham's losses will increase unless Defendants are permanently enjoined from continuing their deceptive and unfair business practices.

140.     Wyndham will continue to suffer irreparable harm to its reputation and goodwill unless Defendants are permanently enjoined from continuing its deceptive and unfair business practices, and, as a result, Wyndham lacks an adequate remedy at law.

141.     Wyndham is entitled to recover its attorney's fees and costs from Defendants under Sections 501.2105 and 501.211, Fla. Stat.

WHEREFORE, Plaintiffs respectfully request the Court enter preliminary and permanent injunctive relief against all Defendants, award Plaintiffs their costs, and for such other and further relief as the Court deems appropriate.

## COUNT IV
### Civil Conspiracy (against all Defendants)

142.     Wyndham adopts and realleges paragraphs 1 through 108 above as if fully set forth herein.

143.     This is a cause of action for civil conspiracy to interfere with existing contractual relations and/or advantageous business relationships and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and costs, and is within this Court's jurisdiction.

144.    Defendants are parties to a civil conspiracy.  Defendants had a common design, each having the intent and knowledge of the others' intent to accomplish by concerted action unlawful purposes and/or lawful purposes by unlawful means.

145.    Defendants conspired to do an unlawful act to cause Plaintiffs harm.  Defendants acted in concert with a common design, scheme, or plan to bring about a desired result and/or accomplish a preconceived plan for financial gain to the detriment of Plaintiffs through unlawful and/or illegal means of interfering with Plaintiffs' business relations with it owners and/or causing its owners to breach their contractual agreements with Plaintiffs.  Defendants committed or engaged in overt acts in furtherance of their unlawful conspiracy to interfere with Plaintiffs business relations or to induce Plaintiffs' customers to breach their contractual agreements.

146.    Defendants conspired to interfere with Plaintiffs' business and contractual relationship with the Wyndham Owners and/or were directed by other Defendants to interfere with Plaintiffs' business and contractual relationship with the Wyndham Owners.

147.    Defendants each performed and/or were directed by other Defendants to perform one or more overt actions in furtherance of their conspiracy as set forth hereinabove.

148.    As a direct and proximate result of Defendants' civil conspiracy, Wyndham Owners have terminated, or have sought to terminate, their contractual relationship with Plaintiffs before the expiration of the terms of those contracts.

149.    Defendants did not have any justification or privilege in procuring the breach of such business relationships. As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

150.    Defendants acted willfully and with malice in taking these actions.

151.    Defendants are jointly and severally liable to Plaintiffs for Damages.

152.    Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs request the Court enter final judgment in their favor and against Defendants, jointly and severally, for actual damages, together with interest thereon, punitive damages, an award of court costs, entry of preliminary and permanent injunctive relief, and for such other and further relief as the Court deems appropriate.

### COUNT V
### Violation of Florida Timeshare Act (against all Defendants)

153.    Wyndham adopts and realleges paragraphs 1 through 108 above as if fully set forth herein.

154.    This is a cause of action arising under the Florida Vacation Plan and Timesharing Act, Chapter 721, Florida Statutes.

155.    Defendants are engaged in timeshare interest transfer services as defined in Fla. Stat. § 721.05(52) as they are collectively engaged in offering and providing goods and/or services relating to an offer or agreement to transfer ownership of a consumer resale timeshare interest, or assistance with or a promise of assistance in connection with the transfer of ownership of a consumer resale timeshare interest.

156.    Defendants have violated the Florida Vacation Plan and Timesharing Act, Fla. Stat. § 721.17, by:

        a.      failing to include in all agreements with Wyndham Owners the language required by Fla. Stat. § 721.17(3)(b);

        b.      failing to maintain and utilize the escrow account required by Fla. Stat. § 721.17(3)(c);

      c.      requiring payment from Wyndham Owners immediately upon entering into an agreement with any of the Defendants and not after services have actually been performed, as required by the statute; and

      d.      transferring timeshare interests to a transferee that does not have the ability, means, or intent to pay all assessments and taxes associated with the timeshare interest.

157.    Because USCA charges more than $600 for its services, it is not exempt pursuant to Fla. Stat. § 721.17(3)(h)(2).

158.    Because DC Law charges more than $600 for its services, it is not exempt pursuant to Fla. Stat. § 721.17(3)(h)(2).

WHEREFORE, Plaintiffs respectfully request this Court enter final judgment in their favor and against Defendants, jointly and severally, for its actual damages, together with interest thereon, attorneys' fees, and costs, and for such other and further relief as the Court deems appropriate.

## COUNT VI
## Tortious Interference with Current and Prospective Business Relationships
## (against all Defendants)

159.    Wyndham adopts and realleges paragraphs 1 through 108 above as if fully set forth herein.

160.    This is a cause of action for tortious interference with advantageous business relationships and for damages in excess of $75,000.00, exclusive of interest, attorney's fees and costs.

161.    Plaintiffs have advantageous business relationships or prospective business relationships with identifiable third parties, specifically the Wyndham Owners.  Plaintiffs expend

considerable time and resources developing and cultivating current and prospective business relationships with its owners.

162.    Defendants have actual, constructive, and/or specific knowledge of the relationships between Wyndham and the Wyndham Owners. The very fact that Plaintiffs have a business relationship with the Wyndham Owners is the basis under which Defendants sought to establish a relationship with the Wyndham Owners.  Indeed, if it were not for the existence of the relationships between Wyndham and the Wyndham Owners, Plaintiffs would have no reason to exist.

163.    Defendants, through various inter-related entities as described hereinabove, have successfully solicited Wyndham Owners and caused them to breach and/or terminate their relationships with Plaintiffs and, specifically, with WVR, WRDC, and/or SV.

164.    As stated above, Defendants have intentionally and without justification interfered with Plaintiffs' relationships by convincing Wyndham Owners to immediately stop making any further payments under their contracts without any legal basis and/or by making frivolous and unsupported allegations against Wyndham.

165.    Defendants have utilized improper and/or illegal means to interfere with Plaintiffs' business relations.

166.    Defendants' actions were done with improper motive and not made in good faith, but rather were made with the knowledge and predominant purpose to injure Plaintiffs or with reckless disregard for the attendant consequences naturally, directly, and proximately resulting from Defendants' actions and without reasonable grounds for Defendants to believe that their actions were justified and proper.

167.     As a direct and proximate result of Defendants' intentional misconduct, Wyndham Owners have terminated, or have baselessly sought to terminate, their contractual relationship with Plaintiffs and, more specifically, WVR, WRDC, and/or SV, before the expiration of the terms of those contracts.   These terminations, and attempted terminations, also interfere with Wyndham's ability to enter into subsequent transactions with those same Wyndham Owners.

168.     Defendants did not have any justification or privilege in procuring the breach of such business relationships and their interference with Plaintiffs' business is willful and malicious.

169.     Defendants' interferences inference involves deceit, fraud, undue influence, misuse of inside information, sharp business practices, breach of fiduciary relationships, overreaching conduct, violation of ethical rules and/or constitutes unfair competition.

170.     As a direct and proximate result of the foregoing, Plaintiffs suffered damages.

171.     Plaintiffs are entitled to damages against all Defendants jointly and severally.

172.     Defendants' conduct is intentional and willful and entitles Plaintiffs to an award of punitive damages.

WHEREFORE, Plaintiffs respectfully request this Court enter final judgment in their favor and against Defendants, jointly and severally, for their actual damages, together with interest thereon, punitive damages, attorneys' fees, and costs, and for such other and further relief as the Court deems appropriate.

### COUNT VII
### Request for Injunctive Relief (against all Defendants)

173.     Wyndham adopts and realleges paragraphs 1 through 172 above as if fully set forth herein.

174.     This is a cause of action for temporary and permanent injunctive relief.

175.    Defendants' solicitation of Wyndham Owners using false and misleading advertising and their subsequent instruction to immediately terminate the Wyndham Owners' contracts with Plaintiffs is harming Plaintiffs and constitutes tortious interference with Plaintiffs' existing contractual and advantageous business relationships.

176.    Defendants have engaged, continue to engage, and/or intend to further engage in the conduct described above.

177.    Defendants' actions present an immediate threat of irreparable harm to Plaintiffs, and Plaintiffs will suffer irreparable harm if Defendants, and their agents, affiliated companies or entities, representatives and employees, are not enjoined from this conduct.

178.    The threat of irreparable harm is continuing because Defendants currently engage in an ongoing business whereby they solicit Wyndham Owners using the false and misleading advertising outlined above; and then convince the Wyndham Owners to immediately stop paying all mortgage, maintenance, and tax payments associated with their timeshares, regardless of whether any valid legal basis exists for the cancellation.  These defaults result in loss of good will and damages to the customer relationship with other Wyndham Owners that are not in default and enjoying their Wyndham Contracts.  Non-Defaulting Wyndham Owners will be forced to incur higher fees/payments as a result of the deficiencies caused by Defendants' ongoing actions.

179.    Plaintiffs have no adequate remedy at law as damages will not address the harm Plaintiffs will suffer if Defendants are permitted to continue with this activity. Plaintiffs will have imminently thousands of dollars in delinquent mortgage, maintenance, and tax payments owed to them and will be forced to expend monies foreclosing on the timeshares to recoup these monies to no end as Defendants refuse to cease and desist from this tortious conduct.

180.    There is a substantial likelihood that Plaintiffs will prevail on the merits of their claims against Defendants.

181.    The injury and potential harm caused by Defendants' intentional inference with Plaintiffs' advantageous business relationships outweigh the harm, if any, that an injunction would cause to Defendants.

182.    The issuance of the requested injunction will serve the public interest by protecting Plaintiffs' legitimate business interests and their timeshare owners, and by restraining the disruptive and tortious actions committed by Defendants.

WHEREFORE, Plaintiffs demand a temporary and permanent injunction be entered against Defendants and their agents, representatives, employees, affiliates, and any others acting in concert or participating with Defendants and prohibiting Defendants from: (1) publishing false and misleading misrepresentations on their website or in any other electronic or print media or materials regarding Plaintiffs' owners' cancellation of their timeshare interest without any legal basis; (2) contacting or soliciting Plaintiffs' owners and/or otherwise interfering with Plaintiffs' contractual and business relationships with their owners; and (3) taking or making any distributions, expenditures, or transfers, other than in the usual course of business, from any entity that Defendants directly, indirectly, or effectively control, including, but not limited to, the named Defendant entities, or any such entity that has received any funds from any of the Defendants.  Plaintiffs further seek an award of as well their costs and attorneys' fees and for all other relief this Court deems just and proper.

Dated: September 14, 2018

 */s/ Alfred J. Bennington, Jr.*
**ALFRED J. BENNINGTON, JR., ESQ.**
Florida Bar No. 0404985
bbennington@shutts.com
**GLENNYS ORTEGA RUBIN, ESQ.**
Florida Bar No. 556361
grubin@shutts.com
**SHUTTS & BOWEN LLP**
300 South Orange Avenue, Suite 1600
Orlando, Florida 32801
Telephone: (407) 835-6755
Facsimile:  (407) 849-7255

and

**DANIEL J. BARSKY, ESQ.**
Florida Bar No. 25713
dbarsky@shutts.com
**SHUTTS & BOWEN LLP**
200 South Biscayne Boulevard, Suite 4100
Miami, Florida 33131
Telephone: (561) 650-8518
Facsimile:  (561) 822-5527

*Attorneys for Plaintiffs*

ORLDOCS 16365564 3